IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: FEMA TRAILER FORMALDEHYDE PRODUCTS LIABILITY LITIGATION | * * * * * * * | MDL NO. 1873<br><br>SECTION "N" (5)<br><br>JUDGE ENGELHARDT<br>MAGISTRATE CHASEZ |
| Darius Alexander, together with all individuals and entities whose names appear on the attached "Exhibit A"<br><br>versus<br><br>Monaco Coach Corporation, CH2M Hill Constructors, Inc., and Bechtel National, Inc. | * * * * * * * * * * * | DOCKET 10-3426<br><br>SECT. N MAG. 5 |

## AMENDED COMPLAINT FOR DAMAGES

This Amended Complaint of certain persons of the full age of majority, on behalf of themselves and, in some instances, on behalf of individuals who lack the capacity to sue individually (hereinafter, "Named Plaintiffs"), who are all named in the annexed listing of all Named Plaintiffs (hereinafter, "Exhibit A"), through undersigned counsel, respectfully represents that:

### I.   PARTIES

1. Each Named Plaintiffs is, for purposes of 28 U.S.C. §1332, a citizen of a state other than the state(s) in which Defendants are citizens.

2. Named Plaintiffs are those individuals and entities listed on the attached Exhibit A, which is incorporated herein as if set forth *in extenso*.

3. Monaco Coach Corporation, (hereinafter "Manufacturer"), is, upon information and belief, an entity incorporated in the state of Delaware.

4. The following defendants (hereinafter collectively referred to as the "Contractor" Defendants), upon information and belief, received No-Bid contracts from the Federal Emergency Management Agency ("FEMA") and was tasked with, amongst other things, performing significant functions in the transportation, delivery, installation, maintenance and repair, de-installation and refurbishment of the temporary housing units provided by FEMA to the victims of hurricanes Katrina and Rita:

   a. CH2M Hill Constructors, Inc., is, upon information and belief, an entity incorporated in the state of Delaware; and

   b. Bechtel National, Inc. (hereinafter "Contractor"), is upon information and belief, an entity incorporated in the state of Nevada.

## JURISDICTION AND VENUE

5. Each plaintiff alleges to have suffered damages in an amount in excess of $75,000.00, exclusive of interest and costs.

6. Pursuant to 28 U.S.C. §1332, this Court has subject matter jurisdiction over the claims asserted herein against the defendant(s) with citizenship other than that of plaintiff(s), because of diversity of citizenship and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7. Pursuant to 28 U.S.C. §1367(a), this Court has subject matter jurisdiction over any claims, not otherwise subject to federal jurisdiction, based on the Court's supplemental jurisdiction over these claims.

8. Manufacturer is subject to the in personam jurisdiction of this Court because they do sufficient business in the State of Mississippi and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the State of Mississippi with respect to the activities and claims which are the subject of this litigation.

9. Contractors are subject to the in personam jurisdiction of this Court because they do sufficient business in the States of Mississippi and/or Alabama and within this federal district to confer same, and at all relevant times hereto engaged in commerce both in this federal district and in the States of Mississippi and/or Alabama with respect to the activities and claims which are the subject of this litigation.

10. Venue is proper in the Southern District of Mississippi and/or the Southern District of Alabama pursuant to 28 U.S.C. §1391, as the emergency housing units were provided to the Plaintiffs in this district, and Named Plaintiffs' injuries were sustained in this district.

## II. FACTS AND GENERAL ALLEGATIONS

11. The Named Plaintiffs residing or living in travel trailers, park models, and mobile homes (hereinafter referred to as "housing units") in the State of Mississippi were provided these housing units by FEMA after the landfalls of Hurricane Katrina and/or Rita in September of 2005.

12. Of the housing units at issue, "mobile homes" are generally wider than 8 feet and/or longer than 40 feet, for an average area greater than 320 square feet. They are designed to be used as permanent homes and are defined and regulated by the U.S. Department of Housing and Urban Development ("HUD"). *See* Center for Disease Control and Prevention, INTERIM FINDINGS ON FORMALDEHYDE LEVELS IN FEMA-SUPPLIED TRAVEL

TRAILERS, PARK MODELS, AND MOBILE HOMES, Feb. 29, 2008, at 4, *available at* http://www.cdc.gov/Features/FEMAtrailersFindings/pdf/interim_findings.pdf.

13. Of the housing units at issue, "travel trailers" are wheel-mounted and generally no larger than 8 feet wide and 40 feet long, for an average area of less than 320 square feet. They are designed to provide temporary living quarters and are generally considered vehicles, regulated by state transportation authorities rather than housing authorities. *Id.*

14. Of the housing units at issue, "park models" are larger versions of travel trailers (up to 400 square feet in area). They are designed for temporary living quarters and, although they are manufactured housing, they are exempted from HUD construction standards, typically regulated by transportation authorities and by manufacturer acceptance of a Voluntary American National Standards Institute ("ANSI") standard applying to their construction. *Id.*

15. The residence of each Named Plaintiff was rendered unhabitable following Hurricanes Katrina and/or Rita, leaving each plaintiff homeless and in need of housing assistance.

16. FEMA contracted with the Manufacturing Defendants to purchase thousands of the housing units, primarily travel trailers, for provision to the Named Plaintiffs as temporary housing.

17. On information and belief, Manufactuer expedited production of these housing units, and, on information and belief, resorted to using substandard materials and/or employing irregular practices during the manufacturing process, all of which resulted in the housing units occupied by each Named Plaintiff containing higher than normal levels of formaldehyde.

18. On information and belief, the housing unit of each Named Plaintiff, including those units which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, deviated from Government specifications pertaining to the safety of the unit as a residence.

19. Named Plaintiffs submit that each and all of the housing units which are at issue herein, both those which were manufactured prior to the hurricanes and those later manufactured and purchased by FEMA, did not conform to any Government-imposed specifications which addressed the design and/or construction of the housing units pertinent to formaldehyde levels.

20. Named Plaintiffs submit that each of the housing units at issue, both those which were manufactured prior to the hurricanes and those later manufactured, and purchased by FEMA, contained dangerous levels of formaldehyde due to Manufacturer's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, but that the Manufacturing Defendants failed to warn the Federal Government about these dangers.

21. Named Plaintiffs submit that Manufacturer ignored, or concealed and/or condoned the concealment of, the fact that each and all of the housing units at issue contained dangerous levels of formaldehyde due to the Manufacturer's use of certain materials in their construction, and/or posed the threat of producing dangerous levels of formaldehyde due to the Federal Government's intended use of the housing units as temporary residences for at least 18 months, all in order to sell the Manufacturer's products, and/or

avoid the costs of safety precautions/inspections, and/or avoid litigation by persons injured by formaldehyde emissions.

22. Each and all of the Named Plaintiffs spent significant time in the FEMA-provided housing units manufactured by Manufacturer and provided to Plaintiffs by the Federal Government. As a result, the Named Plaintiffs unwittingly were exposed to dangerously high concentrations of the formaldehyde emitted from products used in the manufacture of the subject housing units.

23. Formaldehyde is found in construction materials such as particle board, fiberboard and plywood, as well as glues and adhesives used in the manufacture of the housing units. Pursuant to federal law, the defendants are required to display a "Health Notice" about exposure to formaldehyde which reads:

<u>IMPORTANT HEALTH NOTICE</u>

Some of the building materials used in this home emit formaldehyde. Eye, nose and throat irritation, headache, nausea, and a variety of asthma-like symptoms, including shortness of breath, have been reported as a result of formaldehyde exposure. Elderly persons and young children, as well as anyone with a history of asthma, allergies, or lung problems, may be at greater risk. Research is continuing on the possible long-term effects of exposure to formaldehyde.

Reduced ventilation resulting from energy efficiency standards may allow formaldehyde and other contaminants to accumulate in the indoor air. Additional ventilation to dilute the indoor air may be obtained from a passive or mechanical ventilation system offered by the manufacturer. Consult your dealer for information about the ventilation options offered with this home.

High indoor temperatures and humidity raise formaldehyde levels. When a home is to be located in areas subject to extreme summer temperatures, an air-conditioning system can be used to control indoor temperature levels. Check the comfort cooling certificate to determine if this home has been equipped or designed for the installation of an air-conditioning system.

If you have any questions regarding the health effects of formaldehyde, consult your doctor or local health department.

*See* 24 C.F.R. §3280.309.

24. According to the National Cancer Institute, formaldehyde has been classified as a human carcinogen (cancer-causing substance) by the International Agency for Research on Cancer and as a probable human carcinogen by the U.S. Environmental Protection Agency ("EPA"). Additionally, the Agency for Toxic Substances and Disease Registry ("ATSDR") has reported to FEMA and members of Congress that not only is formaldehyde classified as "reasonably anticipated to be a human carcinogen," but also that there is no recognized safe level of exposure, and that any level of exposure to formaldehyde may pose a cancer risk, regardless of duration.

25. Most published exposure standards for formaldehyde address protective levels for the adult working population in the workplace, based upon a 40-hour work week, and specifically do not address chronic exposure levels or protective levels for the more susceptible population, for instance, the very young, the elderly and those with respiratory, skin and other chronic diseases. Nonetheless, reference to the levels established by the Occupational Safety and Health Administration ("OSHA") evidences formaldehyde's harmful effects. In 1987, OSHA reduced the amount of formaldehyde to which workers can be exposed over an 8-hour day from 3 ppm to 1 ppm. In May, 1992, the formaldehyde exposure limit was further reduced to .75 ppm.

26. HUD regulates formaldehyde levels in certain construction materials to include the pressed wood products used in manufactured housing (such as prefabricated mobile homes). HUD has far stricter exposure limits for residential formaldehyde emissions. By regulation, "All plywood and particle board materials bonded with a resin system or coated with a surface finish containing formaldehyde shall not exceed the following formaldehyde emission levels when installed in manufactured homes: (1) Plywood

materials shall not emit formaldehyde in excess of 0.2 parts per million (ppm)...[and] (2) Particle board materials shall not emit formaldehyde in excess of 0.3 ppm...". *See* 24 C.F.R. §3280.308.

27. Both the EPA and the ATSDR have suggested values for safe formaldehyde exposure, which are reproduced below, which values are applicable herein since the FEMA trailers/housing units at issue were intended to be occupied for up to a year and a half by evacuees. *See* 44 C.F.R. § 206.110(e).

| Agency | Standard |
|---|---|
| EPA recognized level at which acute health effects can manifest | 0.1 parts per million (ppm) |
| Agency for Toxic Substances and Disease Registry Minimum Risk Levels (MRL) | 0.04 ppm - short exposures up to 14 days |
| | 0.03 ppm – exposure durations between 15 and 364 days |
| | 0.008 ppm – exposures of 365 days or greater |

*See* Union of Concerned Scientists, Citizens and Scientists for Environmental Solutions, *FEMA Exposes Gulf Coast Residents to Formaldehyde*, Updated on Dec 19, 2007, available at http://www.ucsusa.org/scientific_integrity/interference/fema-trailers.html.

28. The Manufacturer knew or should have known of the health hazards inherent in the products it constructed, by familiarity with industry standards, the material safety data sheets in its possession, and published medical studies.

29. FEMA's disaster response obligations are delineated in the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §4121, et seq. (the "Stafford Act"). The Stafford Act outlines two types of temporary housing assistance to be made available to eligible, displaced applicants: financial assistance and direct services. This aid is sometimes referred to as Section 408 assistance. This provision was enacted as Public Law 93-288, Title IV, § 408 (1988). Under the Stafford Act, at 42 U.S.C.A. § 5174, the Executive, through FEMA, may provide "direct assistance" in the form of temporary housing units, acquired by purchase or lease, directly to individuals or households who, because of a lack of available housing resources, would be unable to make use of the alternative "financial assistance" provided under subparagraph (c)(1)(A).

30. In order to implement and manage its disaster response obligation and temporary housing mandate under the Stafford Act, FEMA engaged the Contractor Defendants with No-Bid contracts, eventually amounting to billions of dollars. The Federal Government also relied on the expertise and knowledge of the Contractor Defendants to provide information and advice on, among other things, the conversion of mobile travel trailers into temporary housing units for periods up to, and potentially exceeding, eighteen months in duration.

31. Contractor was tasked with the transportation, installation, site identification and preparation of locations and group sites, preparation of infrastructure to handle the units, inspection of the temporary housing units, maintenance and repair, refurbishment and restoration, and the eventual de-installation and removal of the units.

32. Under the terms of their contracts, Contractor was obligated to adhere to all warnings and instructions relating to the temporary housing units as provided and indicated by the

manufacturers of same. Further, under their No-Bid contracts with FEMA, Contractor was obligated to advise and instruct FEMA regarding the implementation of those contracts. The Contractor Defendants failed to properly fulfill either of these tasks.

33. Contractor contracted with FEMA to pick-up and transport the temporary housing units from FEMA-controlled staging areas and deliver them to areas which Contractor was tasked with operating. These new areas included staging areas to be managed and maintained as assigned to Contractor or individual locations and addresses where the Contractor assigned that temporary housing unit would have obligations to manage and maintain it.

34. To accomplish their contractual obligations with FEMA, in addition to the use of subsidiary companies, Contractor entered into numerous sub-contracts, but at all times retained supervisory capacity and responsibility under their individual contracts with FEMA.

35. Contractor was tasked under their contracts with FEMA to identify and prepare the infrastructure for the various group site locations. This included, amongst other things, ensuring there would be adequate water, sewage, electricity, etc. Contractor knew or should have known that these preparations were for long-term occupancy of the temporary housing units.

36. Once the temporary housing units occupied by the plaintiffs were transported and delivered to a particular location, Contractor had the responsibility for installing that temporary housing unit. Contractor installed the temporary housing units by "blocking" the unit. This meant raising a plaintiff's unit several feet into the air and off of its wheel base, and setting it on concrete blocks.

37. By blocking the temporary housing units of each plaintiff, Contractor created stress and flexing on the frames of the unit as it was not designed to be lifted off of the wheel base. In fact, the manufacturers of the temporary housing units warned in the various owners' manuals provided with the units, that units should not be jacked so that the vehicle's weight is no longer supported by the wheels.

38. The stress and flexing of temporary housing units' frames caused by Contractor "blocking" them with weight off of the wheels created distortion in the travel trailer's shell allowing increased moisture intrusion which contributed to increased formaldehyde exposures.

39. The temporary housing units occupied by the plaintiffs which were provided by FEMA were for the most part travel trailers. The travel trailers are, by definition, mobile. They are designed for and intended for periodic, recreational use and not for long-term habitation. By installing the travel trailers on concrete blocks for extended occupancy, Contractor knowingly and intentionally modified the design and the actual use of these units occupied by the plaintiffs by converting them into a temporary housing unit to be used as a residence for long term occupancy in some instances exceeding 18 months.

40. Contractor failed to consult with the Manufacturing Defendants of the temporary housing units with regard to the installation, warnings, warranty issues or advisability of using travel trailers for long term residence and occupation. Contractor took actions which voided the warranties of the manufacturers and directly created or contributed to unsafe and hazardous living conditions in the temporary housing units.

41. Once Contractor had completed the transportation, delivery and installation of the temporary housing units occupied by the plaintiffs, Contractor was tasked with inspecting

each unit to ensure that it was safe and habitable, prior to occupancy by the plaintiffs. Upon information and belief, Contractor failed to adequately inspect the temporary housing units occupied by the plaintiff(s) to ensure that the units were safe and suitable for their intended use – the long-term occupancy by individuals and families displaced by hurricanes Katrina and Rita. This failure to properly inspect the units for unsafe or hazardous conditions directly contributed to the adverse health effects suffered by hurricane victims.

42. In addition to transportation, site identification, installation and inspection, the temporary housing units occupied by the plaintiffs provided in response to hurricanes Katrina and Rita were also managed, maintained and repaired by Contractor, or its various subcontractors over whom they maintained direct oversight and responsibility. Upon information and belief, Contractor failed to adequately manage, maintain and repair the temporary housing units which enabled and contributed to the unsafe and hazardous conditions that led to adverse health effects amongst the plaintiffs.

43. Parallel to its duty to manage, maintain and repair each temporary housing unit Contractor failed to undertake appropriate action, maintenance or repair in response to numerous complaints made by the plaintiffs of the temporary housing units to various adverse health effects caused by exposure to elevated levels of formaldehyde.

44. Following the plaintiffs' occupancy of each temporary housing unit, Contractor was tasked with its de-installation. Upon discovering the deteriorated condition of the temporary housing units at the time of de-installation and removal, Contractor failed to identify the unsuitability of the temporary housing units for long-term occupancy.

45. In addition to de-installation of the temporary housing units, Contractor was tasked with refurbishment and restoration of the temporary housing units for use, either in direct response to hurricanes Katrina and Rita or for use in the future. By restoring and refurbishing these temporary housing units, Contractor warranted that the units were fit for their intended use, long term occupancy in response to disaster related displacement. By restoring and refurbishing these temporary housing units, Contractor created and perpetuated existing hazardous conditions which would foreseeably lead to adverse health effects caused by the elevated levels of formaldehyde in the temporary housing units. Further, in thousands of cases, following the restoration and refurbishment, these temporary housing units were immediately occupied by new individuals or families displaced by hurricanes Katrina and Rita, and who were then directly exposed to hazardous levels of formaldehyde.

46. Contractor, at every stage of their involvement, failed to warn the plaintiffs of the potential risk of hazardous and unsafe living conditions due to the presence of elevated levels of formaldehyde – a known human carcinogen – which led directly to adverse health effects, including but not limited to the advent of childhood asthma and the onset of adult asthma in some of the plaintiffs.

47. Through its actions and omissions, Contractor created and perpetuated a situation wherein occupants of the temporary housing units were exposed to elevated levels of formaldehyde and, as a result, suffered adverse health effects. Contractor negligently failed to adhere to the manufacturer instructions and warnings related to: (1) the manufacturers' intended (short-term) use of the temporary housing units; (2) the installation and set-up of the temporary housing units; and (3) the warning that the

temporary housing units contained urea formaldehyde resin which would release formaldehyde gas directly into the intended living space.

48. Contractor failed to warn the occupants of temporary housing units of the hazardous conditions created by the elevated levels of formaldehyde in the temporary housing units.

49. By restoring and refurbishing the trailer for future habitation, Contractor improperly and negligently warranted that the units were fit for the intended use of long-term occupancy.

50. Finally, despite these failures, the Contractor Defendants received billions of dollars in contracts from FEMA and the United States government, at the expense of the health of the plaintiffs who simply had nowhere else to go and who were relying on FEMA and its contractors to keep them safe in the aftermath of the greatest natural disaster in the history of the United States.

## COUNT 1:
## STRICT PRODUCTS LIABILITY
## MS CODE ANNOTATED § 11-1-63

### PRODUCTS LIABILITY: DEFECTIVE MANUFACTURING AND DESIGN

51. Manufacturer, at the time that each subject housing unit left its control, knew or should have known that each product was defective because it deviated in a material way from the manufacturers' specifications or from otherwise identical units manufactured to the same manufacturing specifications.

52. Manufacturer knew or should have known that the defective condition rendered each subject housing unit unreasonably dangerous to the user or consumer or others; and

53. The defective and unreasonably dangerous condition of each product (the failure of the subject housing units to be safely habitable without exposure to formaldehyde) proximately caused the damages and injuries sustained by each Named Plaintiff.

54. At the time the subject housing units left the control of Manufacturer, each subject housing unit did not contain properly selected prepared and installed components.

55. At all relative times, each Named Plaintiff lacked actual or constructive knowledge of the defective condition of their respective housing units and that each defective product was inconsistent with their safety.

56. At all relevant times, each Named Plaintiff did not appreciate the danger of their housing unit's defective condition.

57. At all relevant times, each Named Plaintiff did not deliberately and voluntarily choose to expose themselves to this danger in such a manner to register assent to the continuance of the dangerous condition.

58. Each subject housing unit in question failed to function as expected as a result of their design characteristics.

59. An alternative design existed at the time that each housing unit left the control of Manufacturer which would have not impaired the product's usefulness or desirability.

60. The alternative design would have to a reasonable probability prevented the toxic exposure of each Named Plaintiff.

## PRODUCTS LIABILITY: FAILURE TO WARN

61. Each product (housing unit) was defective because it failed to contain adequate warnings or instructions.

## PRODUCTS LIABILITY: BREACH OF EXPRESS WARRANTY

62. Each product (housing unit) breached an express warranty and/or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use this product.

## COUNT 2:

## NEGLIGENCE OF CONTRACTOR DEFENDANTS UNDER MISSISSIPPI LAW

63. Each Named Plaintiff incorporates the above allegations as if fully repeated verbatim herein.

64. At all relevant times Contractor was tasked with the transportation, installation, site identification, preparation, inspection, maintenance and repair, refurbishment and restoration, and removal of the temporary housing units, which caused the Plaintiffs' injuries.

65. Contractor owed a duty to each Named Plaintiff to provide, transport, install, inspect, maintain, repair, refurbish, recondition and restore safe temporary housing units that did not emit hazardous levels of formaldehyde.

66. Contractor knew or should have known when it provided, transported, installed, inspected, maintained, repaired, refurbished, reconditioned and restored the temporary housing units to the general public (thereby modifying and converting the mobile units into residential installations) the actual and intended use of the temporary housing units by each plaintiff, and that the temporary housing units would be used in the manner that each plaintiff herein used the temporary housing units.

67. Contractor breached its duty to each Named Plaintiff in failing to act reasonably in the provision, installation, inspection, maintenance, repair, refurbishment, reconditioning and restoration of the temporary housing units; specifically by:

    a. Failing to sufficiently warn the plaintiffs of the inherently dangerous properties or the foreseeable conditions of the temporary housing units when used for long term occupancy;

    b. Failing to adhere to the manufacturers' warnings against jacking the temporary housing units off the wheel base by "blocking" the units;

68. Contractor's actions were the proximate cause of the increased exposure of formaldehyde to the each Named Plaintiff.

69. Contractor contributed to and exacerbated the adverse health impacts upon the residents of the temporary housing units.

## COMPENSATORY DAMAGES

70. In addition to and by way of summarizing the compensatory damages prayed for herein, each Named Plaintiff avers that the defendants, Manufacturer and Contractor, individually and/or jointly are responsible for all damages which each Named Plaintiff herein has suffered and continues to suffer as a consequence of defendants' acts and/or omissions as pled herein, which damages include, but are not limited to, past and future physical injuries, past and future mental and physical pain and suffering, past and future physical impairments and disability, past and future reasonable and necessary medical expenses, past and future loss of earning capacity, past and future loss of enjoyment and quality of life and other damages and injuries, loss of consortium, and loss of use and/or opportunity to use safe and adequate shelter during the period of displacement from a natural disaster, as well as, all general, special, incidental and consequential damages as shall be proven at the time of trial.

71. The damages sought herein by Named Plaintiffs on behalf of deceased family members were caused by decedent's exposure to formaldehyde as set forth herein, which damages include, but are not limited to, those available to Named Plaintiffs in wrongful death and

survival actions, including loss of society, loss of support, survivor's grief, and incidental damages such as funeral and burial expenses.

## PUNITIVE / EXEMPLARY DAMAGES

72. Pursuant to Miss. Code Ann. § 11-1-65, inasmuch as the conduct of Manufacturer and Contractor and their servant/employees constitutes willful, wanton, egregious and reckless disregard for the rights and safety of the plaintiffs, an award of punitive damages is appropriate and necessary under these facts.

## REQUEST FOR JURY TRIAL

Each Named Plaintiff is entitled to and demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs pray that Manufacturer and Contractor be served with a copy of this Complaint, and that, after due proceedings:

1. there be a judgment herein in favor of each Named Plaintiff and against Defendants for all compensatory damages and punitive damages together will legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees, declaring that the defendants are liable for all applicable damages and thereafter;

2. there be specially included in the judgment in each Named Plaintiffs' favor, provisions for the following damages and relief as found applicable and supported by the evidence:

   a. past and future physical injuries,

    b.    past and future mental and physical pain and suffering,

    c.    past and future physical impairments and disability,

    d.    past and future reasonable and necessary medical expenses,

    e.    past and future loss of earning capacity,

    f.    past and future loss of enjoyment and quality of life,

    g.    loss of consortium and/or society,

    h.    compensable out-of-pocket expenses related to defendants' wrongdoing, and

    i.    costs of court,

    j.    punitive damages,

3. all other general, equitable, and further relief as the Court may deem just and proper.

Respectfully submitted, this the 1st day of October, 2010.

                                    By:    /s/ Casey L. Lott
                                                CASEY L. LOTT,
                                                Miss. Bar No. 101766
                                                Alabama Bar No. LOT007
                                                Attorney for Plaintiffs

Of Counsel:

**LANGSTON & LOTT, P.A.**
Post Office Box 382
100 South Main Street
Booneville, MS 38829

Telephone: (662) 728-9733
Facsimile: (662) 728-1992

**Please Serve (see attachment certifying compliance with PTO 55):**

Monaco Coach Corporation
Through its agent for service of process
Richard E. Bond
606 Nelson's Parkway
Wakarusa, IN  46573

CH2M Hill Constructors, Inc.
Through its registered agent for service:
5615 Corporate Blvd., Suite 400B
Baton Rouge, LA  70808

Bechtel National, Inc.
Through its Agent for Service of Process
CT CORPORATION SYSTEM
645 Lakeland East Drive, Ste. 101
Flowood, MS 39232
And through its Counsel of Record
Peter Tafaro
Frilot, LLC
1100 Poydras Street, Suite 3700
New Orleans, LA 70163